Brown, is this case on the docket 2-17-0835 Mirhead HUI L.L.C. v. Forest Preserve District of Kane County Defendants and Athletes. Arguably on behalf of the Defendants and Athletes, Mr. William M. Shea. Arguably on behalf of the Defendants and Athletes, Ms. Amanda Jo Hamilton. Also arguably on behalf of the Defendants and Athletes, Mr. Patrick M. Powell. Mr. Shea, you may proceed. Thank you. Good morning. Good morning. Counsel. May it please the Court, again, I'm William Shea and my colleague Melissa Schoenbein from the firm Shea Phillips here representing the plaintiffs' appellants. I would like to reserve five minutes. Sure, you are. Okay, this case is here today on appeal for an order of the Kane County Circuit Court. Honorable Judge Ackerman granting the Defendants' motion under section 2619 to dismiss. That order was entered September 19th of last year. On review here, the standard review is de novo. No deference is to be given to the trial court's determination. And the pleadings and supporting documents and inferences therefrom are to be construed in the light most favorable to the plaintiff's appellants. Lastly, it's the burden of the Defendants to plead and prove lack of standing. The area involved with this case is known as the Muirhead Springs Forest Reserve in Kane County. And it lies just east of Route 47 and along the north side of Rorson Road. Along railroad tracks, I believe they're referred to in the complaint as the Canadian National Railway railroad tracks. The plaintiffs here challenge and seek relief as to certain deeds that were recorded. We're pretty conversant with the facts. Can you just get into the standing issue first? What it's like, why your clients have standing? Yes, Your Honor. First, the deeds are important legal documents approaching the status of being sacrosanct. And this gets into the standing issue. The law is clear that one party to a deed may not unilaterally alter it, either by way of reformation or otherwise, without the consent of the other parties. Who altered this? Who altered the deed? Who altered it? Oh, who altered it. The deeds in question were altered several times, all by the Forest Reserve District and their attorneys. Did your clients bargain for this restrictive covenant in the negotiation of the ultimate contract regarding the sale of the land? Well, Your Honor, there's nothing in the record, that being the complaint and the supporting documents, that answers that question. So if I were to answer that question, I'd be speaking from facts outside the record. Well, why don't we look at the real estate sale agreement or agreements? We have several parcels here. I have one of them here in front of me, starting at C-316. Can you point out where there's any indication that your clients have reserved any type of covenant interest in this land? Well, Your Honor, I was going to do that. I was going to use another one of the deeds and sale agreements I have in front of me. Do you have a sale agreement, or were there any preference given to the prior owners? Where there's what? Any preference given to the prior owners? Preference? Any statement, any reference, any statement to the prior owner? I can, I think, shed light on that question by looking at the real estate sale agreement by me, starting in the record at page C-558. And this was one where the grantors were individuals, including Robert C. Muirhead, one of the plaintiffs. And that was to a parcel, two parcels, and one of those parcels has a deed, corresponding deeds, and the deeds start at page C-121 in the record. And I would point out the sale agreement refers to restrictions in two places. First on page 1 of the sale agreement, and that's at 558 in the record. Paragraph 2F says, and I quote, Specific restrictions to be reserved by seller as grantors as described on Exhibit B attached here too. And then if you page on to the end of that agreement, specifically Exhibit B, it says specific restrictions. And then on the next page, part of that exhibit, is the restriction in question. I can read that if you'd like. The real property described herein must be maintained for public outdoor recreation use purposes. We have that. So that's in the sales agreement? It's in that sales agreement. It's not in all of them. But there's reference to restrictions in, I believe, all the agreements. And there's also a reference in the, I believe, all the sale agreements to a grant that was going to be, that was contemplated but yet wasn't in existence yet, and language that the parties would cooperate in trying to qualify and receive grant funds. How is it that your claims can enforce that restriction, though, as opposed to the Department of Natural Resources? Well, I think the law is pretty well settled in this state that the grantors or sellers of property who convey it subject to a restrictive covenant, that on its face is reasonable, valid, not violated public policy, not a law challenge and not unclear, have a right, an ongoing right and interest in that property to influence its use to make sure it's in accordance with the restriction. And case law establishes that. So also with respect to the Petersdorf plaintiffs, they weren't grantors. Mrs. Petersdorf is a member of the LLC that was one of the grantors, but she was not individually a grantor. But they live in a home that is adjacent to, that is in the middle of some of these properties and adjacent to the proposed route for the transmission line that they objected to and which would have violated the restrictive covenant. So I think those are the bases on which. The other point I'd make about that, Your Honor, is if you think about the back-to-property class in law school and when you convey property, you're conveying bundled sticks, and sometimes it's all of them. In this case, it was not all of them. The grantors reserved a few sticks out of that bundle in the form of that restrictive covenant, and they had the right to enforce it. The IDNR, I contend, would have probably not had a right to enforce that grant as it existed in the deeds because they were not party to the deeds. Now, maybe they could argue they were third-party beneficiaries of those deeds, but I think that would be a tenuous position to take. Now, what the IDNR could enforce is the grant restriction existing in the grant document itself. Let me give you a hypothetical on that. If IDNR came in and said, you know, we have agreed that the Forest Preserve District can sell this land, this particular land we're talking about, to a hog farm, I mean, your class wouldn't have any right to stand on there because the grant gave IDNR the authority to approve sale. No, Your Honor, I don't think the record shows that the IDNR approved the sale up front. They came in and they approved a restriction, a 2005 restriction, that was added that was a conditional payment grant in 2005. See, the grant wasn't made until later, after the closing, well after the closing. I'm talking about the restrictive covenant in the deed. The restrictive covenant in the deed, you know, says that basically the Forest Preserve District can do what they want, or the property shall not be sold unless IDNR approves it. Right? Oh, certainly, yeah. The Forest Preserve District could have later sold it, but, you know, this restriction that's in the deeds runs with the land and would be binding on success as an interest. So it's the first part of that restriction. The language says, must be maintained for public outdoor recreation use purposes only. That isn't waivable. That isn't modified by the and or the sold or exchanged and prior approval from the State of Illinois. That prior approval language clearly applies only to the portion of the restriction following the word and appearing in the middle of it. So, again, the main point of this is this deed restriction, although it's worded with reference to, you know, State grant program, the OSLOD, OSLED, and the IDNR, that was, I think, a matter. Again, we don't have the facts. We weren't entitled to develop them. But I think what may have happened here is that this was a language of convenience. We've got to read this whole thing in its entirety, correct? I mean, we can't just – what I'm getting from your argument is that you want us to kind of take out and basically pull out of this that the real property must be maintained for public outdoor recreation use purposes only and then stop there. But it goes on and says, as prescribed by DNR, under the terms of this open lands acquisition. I mean, so if we don't get to the DNR approving it under the open lands acquisition, why do we just pull that first phrase out and just enforce that against the purchasers? Right. I think the reference to the open space lands acquisition was a matter of convenience because at the time of the transaction, I believe, the Forest Preserve District knew they were going to apply for a grant, and they had an idea that the IDNR would want restrictive language in here. And this was a matter of convenience for the parties. But there's nothing to suggest that. And, in fact, the sales contract suggests that the grantors wanted this kind of restriction in here. And so rather than them coming up with their own language, this was convenient, it was available, and worked for both purposes. Don't we have to look at the plain language of the deed? The plain language of the deed? Yes. I'm sorry. We have to look at the plain language of the deed. We can't really interpret it the way somebody else thinks it should be interpreted or put our own spin on it, can we? No. No, you're right. And this language is in the deeds, and I think is clear. You know, the key part of this restriction that applies here is, I'm not saying the rest of it should be ignored, but it clearly says the property must be maintained for public, outdoor recreation purposes, use purposes only. And there's nothing subsequent to that in that language that removes that or modifies it or allows it to be modified in any way or even waived. And if the property is sold later, then it's clear, I think, from this restriction, that the successor takes it subject to that use restriction. You rely on the Stream Sports Club case versus Richmond. In that case, the plaintiff was the successor to the interest in that case, but in this case, your clients are not. Isn't that the distinguishing factor in that case? Well, I'm not sure it is, Your Honor. Your Honor, I mean, I think here we're not at least the LLC and Mr. Muirhead were grantors, not successors, and so they were directly involved in the transaction, and they are directly seeking to enforce the covenant that was embedded in the deeds. But they're not referred to in the covenant, right? No. The only party referred to in the covenant is the Department of Natural Resources. Yes. So isn't the inference there, though, that they are the beneficiary of that restricted covenant? No, I think that's an inference that's not permitted legally, Your Honor, with all due respect. Again, that's a reference to a state agency that the Fourth Preserve District was planning to apply for a grant from, and this is the kind of language that that agency at the time appeared to require in the event of a grant. So the parties were looking ahead to getting a grant, but I think the evidence would show, if we're allowed to develop it, that the grantors wanted the uses of this property restricted because it was farmland. That's true, but wouldn't there be a different way or a better way of going about that? There could be various ways to word the covenant, yes. Maintain for public outdoor recreation purposes only. It could have stopped there. It didn't, but I think the legal effect is the same. They didn't, I mean, this land was in their family for many generations. It was farmland. They didn't want it developed, and they liked the Fourth Preserve District's stewardship of it, given the mission of the Fourth Preserve District and what they expected to use it for. And I think, again, I think the evidence could show, if we were allowed to develop it, that at least Mr. Muirhead wanted to help make sure that Sarah and Mike Petersdorf's home property weren't disturbed by a high-voltage transmission line. If you wanted that, I mean, if the sellers wanted that, why wouldn't it have been, I mean, more specifically in the deed? I mean, the way the deed is written links everything, you know, basically the way it's written to this grant program, which is consistent with the contracts, which I think most of them, if not all of them, say that the seller has agreed that it will cooperate with the purchaser in the completion of all documentation related to the grant. Right. So then part of that is executing a deed with this restriction in there that relates to the grant. Now, you're trying to relate it to just your clients separate from the grant, because the grant never applied to this parcel, correct? I mean, they took it out of it at some point in time, the parcels that we're talking about, didn't they? Yes. Because it was part of the original grant proposal, and then it was removed from it. Well, from parcels covering other than the 200 acres. The grant was shrunk from 532 acres down to 200. I would say the, again, I'm over my time, but the restricted covenant in 2003 served two purposes. It satisfied the desires of the grantors, and it satisfied the Fourth Preserve District's anticipated need, the condition of getting the grant. So it served dual purposes. Okay. I think that's fair to say. Did your clients have any part in that grant? I'm going to strike that. In that restricted covenant being inserted in 2003? Yes. If we were allowed to. I mean, it's in the sales agreement. I mean, that's evidence. And, again, I'm hesitant to answer definitively because that's a fact that we don't have developed yet. Thank you. Thank you, Counsel. Thank you. Ms. Hamilton, you may proceed. Good morning, Your Honors. Good morning. Counsel. My name is Mandy Hamilton. I represent one group of the appellees in this case, specifically Attorney Hodge and his law firm. May it please the Court. As it relates to the Hodge defendants, this case is about whether non-client sellers who are unhappy with the way that their property or their former property is being used should have the ability to sue the buyer's attorney for legal malpractice. And I think the answer is very, very clearly no. Judging them to correctly dismiss plaintiff's claims of prejudice based on lack of standing, but I think the record in the case file in Illinois is clear that, as it relates to the Hodge defendants, the two claims against them should be dismissed with prejudice simply because there is no attorney-client relationship. There's simply no precedent in Illinois for having an attorney owe a duty to his client's adversary in a real estate agreement. Now, the allegation is that Mr. Hodge unilaterally removed the prescription? That is the allegation as to counts 4 and 7, which are the ones that are against Mr. Hodge. They're titled legal malpractice, and the other one is for intentional interference with a real property interest, which, as we pointed out in our brief, isn't actually a cause of action in Illinois. So, except with legal malpractice for the most part. The facts as alleged, if I'm mistaken, are that he removed it and then later went to the plaintiffs and asked if he could remove it. They said no, but now it's still removed. That is the allegation, yes. And as going through the record as well, I think it's important to note, and this kind of comes in later to my argument as far as whether or not this actually is removed, currently there are no power lines on the property. There's no allegation that the property is currently being used in any violation of the covenant. So there's been no specific finding as to whether those covenants are still in place or not, based on the alleged removal and rerecording. I know my co-defendant's counsel is going to speak more to that specific issue as to the recording of the deeds. But what do you mean that they are no longer there? Hodge re-recorded the deeds, right, without the restrictions. However, the way in which the deeds are recorded, and again, my co-counsel is, I know, very excited to talk about much of the procedure with that. We don't believe there's actually any harm here. I think that there has not been any damages. But how is it, and where does he get the authority to just remove a restricted covenant without talking to others about it? From his client, from his client who owns the property. And as Your Honor has correctly pointed out, the Illinois Supreme Court has been very clear in that, first of all, restrictive covenants are strictly construed in favor of the full and unlimited, legitimate use of the property. And when there's any doubt, the matter must be resolved in favor of natural rights and against restrictions. So that's first and foremost. And then secondly, the other Illinois Supreme Court case that he cited in our brief, I'm sorry, the first one was Watts v. Fritz, was the Hazy St. Paul Church case where the Illinois Supreme Court specifically talked about how you must construe the covenant as a whole, and it must be extremely clear from the terms of the deed itself that the restriction was for the benefit of the complaining party. And if it's not, they don't have standing. And as demonstrated by the actual language of the covenant, the benefit was for the Illinois Department of Natural Resources and their grant program, and really for my client's client, a.k.a. the King County Forest Preserve, who purchased this property, had the covenant placed on there so that it could seek this grant and get money to complete this purchase. Counsel argues that this covenant was bargained for in the agreement. He pointed to C558 listing the restrictions in the settlement agreement. Do you agree with that? I don't, Judge. I don't think that the record and the way that the complaint was worded has an allegation at all. It does mention specifically that the covenant was included so that the King County Forest Preserve could apply for that grant program. But more importantly, Judge, I think that even if that were the case Are you denying that the sales agreement had that language? No, no. I'm sorry, I'm not denying that the sales agreement had that language, but what I am saying is that that's not enough. The deed covenant itself is what we go by according to the Elementary Supreme Court. So if that was something that, let's say hypothetically, that the plaintiffs really, really did feel strongly about making sure that this covenant was in place and that they would have a right to enforce it, the covenant language would need to read differently. It would need to reserve that right for the plaintiffs. It would need to have some language, such as the other cases that we've discussed, and I know Your Honors are familiar with the briefs, but where there's a right of return or a right to bring a cause of action or a right for damages. And if plaintiffs are upset with the language of the deed, of the covenant, of the way that it was included in the deed, they were represented by their own attorney during this closing. They certainly don't have a claim against their opposing party's attorney for legal malpractice as it relates to the language of the covenant, the language of the deed, the language of the sales contract, any of that. Illinois law is very, very clear that based on the nature of the attorney-client relationship, the attorney can only owe a duty to his or her client in very, very rare circumstances where you owe a duty to a third party. I feel very strongly about this. This is the majority of what I do and what I've spent my legal career doing is legal malpractice and ethics. So you're saying one of the exceptions, though, is fraud, right? It says that you can bring a claim for fraud against an attorney, yes. A non-client can file a claim for fraud against an attorney. But as the plaintiffs and appellants strenuously argued in their reply brief, they didn't set forth a claim of fraud or collusion. They set forth a claim of legal malpractice. And the reasons behind delimiting legal malpractice claims are really important. It's to protect the integrity of the attorney-client relationship and to protect the way that we as attorneys represent our clients faithfully and the way we advocate for them, the way we communicate with them, the way that we kind of govern our own profession. So that's why it's so important that a non-client who was being represented by their own attorney and in a position adverse to my client's client not be permitted to bring a claim of legal malpractice. Getting back to the standing and mootness issue, I think that, Justice Shostak, you were exactly correct when you noted the differences between the stream sports case. In that instance, the covenant actually gave the plaintiff a lien on the property and it dealt with the payment of fees. There's no such language here. There's no such lien. There's no such reserved right. Many of the other cases that we discussed in our briefs, and again, kind of going back through my briefs, I wish I would have done a better job with this, discussing the Sadler v. Creekman case, where there's a homeowner's dispute between neighbors and one neighbor was very upset with the other neighbor who wanted to construct another building on their lot. These are huge lots. The neighbor then filed the lawsuit against the other neighbor who wanted to be building, as well as the homeowners association and the homeowners association's attorney, saying that the homeowners association had the covenant in place and wasn't enforcing it properly, and neither was the homeowners association attorney. And the third district properly rejected that, went through a long list of reasons as to why such a claim is inappropriate, and at the end of the day, no such building was ever built. So I think that kind of also gets us back to the mootness issue of there's no allegation that power lines did go up. There's no allegation that any such covenant were currently being breached. So in effect, it's almost asking this court to give a hypothetical opinion as to whether or not there could be potential for breach in the future, which I think is inappropriate. If I have a covenant that moves to my benefit and I have standing, and then some party, you know, the owner, just goes and records it, removing the covenant, I mean, I can file a lawsuit, can I not to put it back on so that my heirs and whatever will have the benefit of that covenant? Absolutely, Judge, but I don't think that your lawsuit would be directed against the party who owns that property's attorney. And if I may, I'm actually going to borrow my whole counsel's demonstrative just simply because I'm sorry, Mr. Connelly, I'm stealing your thunder with the demonstrative. He was kind enough to blow up the actual language of the covenant just that we, it was clear that I would. Great. Mr. Connelly's a little old school, but you know what, you stick with what works, and sometimes the classics are the way to go. Again, the language of this covenant says nothing about, the plaintiff says nothing about anyone other than the Illinois Department of Natural Resources and this specific grant program, which is what provided the funding to purchase this parcel in the first place. Now, refresh my memory. Was this covenant recorded at the same time as the documents from the closing? I mean, from the get-go? Correct, this is the original covenant, Judge. It wasn't later? Correct. Was it without, of course we know there was another deed filed without that language. Was it ever modified in the interim or not? It was, Judge. When was that? Yeah, it was, and I have to check my dates. The first modification the plaintiffs had no issue with, and they to this day have no issue with that, it was to reflect the grant had been given for the purchase of the property. But again, it's still no mention of the plaintiffs, it's still no mention of anything else. I see that I'm out of time. So that was when the grant was given before it was then downsized? Correct. So the grant originally was given for the full 500 and whatever acres, right? Yeah, the full parcel. So when the grant was given and it was changed to reflect that the grant was given, did somebody pass this change by the plaintiffs and ask their approval? Not to my knowledge, Judge, I don't think that's in the record. But again, I don't think the language of the covenant requires that at all. If anyone would need to give it. But you said they had no objection to it. Oh, I meant in their complaint, Judge, they did not mention that at all. Thank you very much. Good morning. My name is Pat Finnell. I represent the Forest Reserve District, and I want to thank you for taking the time today to listen to the argument that we have here. That is my high-tech exhibit that I put together. And the reason I put it together is to explain a couple of things. I have three points that I'd like to make. First, there's no allegation in this complaint that this property has not been kept as open space. And the plaintiffs know under the Downstate Forest Preserve District Act, the Kane County Forest Preserve District has a limited ability to sell property, very limited. There's no allegation in their complaint that they retained some interest in this property. And that document there tells you that they did not. I want to explain a couple of things about recording in Kane County. Our recorder is Sandy Wegman. So when the first deed got recorded, it had the language from the Illinois Department of Natural Resources. We had to have that language in order to qualify for the grant. The plaintiffs knew this. And in order to qualify for the grant, they wanted that language put in the deed. We said, fine. Who wanted that language put in the deed? Pardon me? Who wanted that language put in the deed? The Forest Reserve? No, the Illinois Department of Natural Resources. The DNR? Absolutely, Judge. And that's the language right there. That's exactly right. Now, there's 500 acres. And all of these deeds are in the public record in the Kane County. And there's been no hiding of this. These deeds that were recorded were done for a couple of reasons. Number one, the Illinois Department of Natural Resources says 500 acres is too big. We can't have 500 acres. We want 200 acres. And the 200-acre restriction still is on the northern part of the property. Okay? It's always been there. And it was re-recorded as such. The first recording expanded the IDNR conservative conservation or the restrictive covenant. The third recording changed this particular covenant to apply to the northern 200 acres because that's what the IDNR told us we could only submit. We couldn't submit it on the 500. Then the final recording was the fact that we took the letter from the IDNR and recorded that with the deed indicating that it only applied to the 200 acres. We went to the plaintiff, okay? We went to the plaintiff and asked them to cooperate with us with respect to that. And they told us no. And you just read from the real estate agreement. It says they had a duty to cooperate. They didn't tell you that in their complaint. And they didn't cooperate with us because we went to them and asked them to do it and they said no, we're not going to do it. They didn't cooperate to remove it, the restriction? They didn't cooperate to put the covenant on the 200 acres as opposed to 500 acres. They wouldn't do it. That's their choice. Was this 200 acres adjacent to their property? Absolutely. It's all contiguous, Judge. So up by the railroad tracks, as counsel indicated, and then all the way south. So anyway. Somebody on behalf of Forest Preserve removed it from these parts. They removed it from the deeds. They had to remove it because the Illinois Department of Natural Resources said it can only apply to 200 acres and not 500 acres. But it's always going to remain open space. It always will remain open space because under the Downstate Forest Preserve Act, there's a couple ways we can sell property. If it's less than an acre, yeah, we can do that. I know it's going to remain open space, but isn't what kind of brought this whole thing to the head was that power line that was going to go through? What brought this to the head was the fact in their complaint they claimed they incurred attorney's fees with respect to their lawyers in the ICC proceeding where Comet applied for a certificate of need because they needed that in order to put the transmission line in. The result of that proceeding was that it doesn't go through the Forest Preserve. It goes up, it goes down, and then it goes east. Because Comet was worried that those restrictions would apply, even after they were removed. Comet raised those. That's true. I'm not here to deny it. They raised it as a defect. We don't agree with that. And there's been no adjudication of that, Judge, with respect to whether it is or it isn't. That was their lawyer's opinion. I respect their opinion. We don't agree with it. But that has never been adjudicated. The other thing with respect to this is there's no reverter. So there's no reversionary interests that the plaintiffs have in this restrictive covenant. None. The only reverter goes to the IBNR. One other thing. The Tummelson case, the fiduciary duty case that they alleged against my client. The Tummelson case has nothing to do with the claim they have here because it's a fiduciary duty in fact case. Fiduciary duty in fact case requires some superior power that the Forest Preserve District has exerted over the plaintiffs in this case. And the Tummelson case clearly indicates in an unjust enrichment action that there was a fiduciary duty between two people that were living together. So Tummelson has no bearing with respect to the Forest Preserve District. Finally and most importantly, one-year statute of limitations. No doubt about it. And the fact is the last re-recording of the deeds occurred on June 30, 2014. They were public records at that time. Always have been. They allege that they learned about this in their own paperwork in the pleadings filed before Judge Ackerman. They learned about this on 2-2-15 when they voluntarily intervened in the ICC proceeding. 2-2-15 means they had to file it by 2-3-16. They filed on 1-30-1-17. Thank you very much. Have a good day. Thank you for listening to me. Thank you, Mr. Connelly. Mr. Shea, would you like to argue? Thank you, Your Honor. Several points here. Yeah, there's no power lines going through that area today. Thanks to the ICC and thanks to our clients for finding out and standing up for their rights before the Commerce Commission. But the fact that there's no damage today isn't determinative at all. The legal standard is actual or threatened injury. And the fact that now they've got this threat hanging over their head without the restrictions and the deeds any longer that ComEd could build. Let me say something. The counsel's argument is that DNR wanted those removed from that property because they wanted it specifically. DNR wanted it clear that the project was only the 200 acres, so they didn't want to have anything to do with these other 300 acres. And if that's the case, I mean, what is the damage here? I mean, because you're saying that we have this bargain for, you know, restrictive covenant, but DNR is the one who seems to be holding all the cards under the restrictive covenant, and they want it removed. How can you guys get it back out? I don't know that there's any evidence that DNR wanted any restrictions removed, Your Honor. Did they want to reduce it to the 200? They wanted to reduce the grant. But they didn't care about whether the remaining property was. Why would they care whether it was restricted or not? They had nothing to do with it. So I think Mr. Connelly is sort of play passing this with the facts here with all due respect. If you look at what happened in 2005, more restrictions were added back then because DNR said, well, it's time to give you that grant. You know, you've got other historical considerations, and we need additional grant language. Well, what should the owners of the property at that time have done? They should have drafted and filed as additional liens on the property separate restrictions, separately recorded. They shouldn't have gone back and altered the original deeds. That's just like when you get a mortgage after you buy a house. If you refinance it and get a lien, you don't go back and alter the original deed. You file it as an additional restriction, and the property is burdened with that until the mortgage is paid off. And so if the 2005 restrictions had been separately recorded, and then later they weren't needed on this 300-some acres, then it would have been perfectly acceptable for Forest Preserve District, with IDNR's consent or otherwise, to remove them from the property records. But they shouldn't have touched the deeds, either to put them on or to take them off. These deeds, and again, it's important to realize you shouldn't be going back behind these deeds in the clear language and asking why was it in there, what was it, who did it benefit, what was the purpose. You know, that's in the nature of parallel evidence. I don't think that's appropriate here, either at the trial court or at this level. What's your response to Mr. Canale's argument that the statute of limitations has run? The defendants committed willful and wanton misconduct. Therefore, to the extent the Tort Immunities Act applies to any of these counts, the tort counts, that removes both the shield of immunity and makes the one-year statute of limitations inapplicable. So, yeah, the plaintiffs learned of three of the deed restriction removals in February of 2015 and learned of others later, in 2016. But the one-year statute of limitations on the Tort Immunities Act should not apply here. And I think it's ludicrous to say that we should have started running in 2014 when the restrictions were removed. At that time, because it was a matter of public record, that suggests that every landowner everywhere should be going back to the courthouse or the recorder's office once a year and examining the deeds to make sure that they haven't been unlawfully altered. With respect to one other point I wanted to make is that this reverter, the lack of a reverter interest, that's of no legal effect whatsoever. That's just one remedy that parties can negotiate and add to a restriction to provide for a type of relief if it's violated. The fact that there wasn't a verter clause doesn't make any difference. There are lots of different types of relief, including the relief we're seeking here. But it is a factor to show the intent of the parties when they enter into these deals, correct? Yes. Because I'm no expert in property law, but the few cases that I've seen involving restrictive covenants, there's usually some mention of the benefit to the part, to the plaintiff in this case, or some type of reversion interest. Well, I think the lack of a verter clause here would prevent the plaintiffs, and that's why we didn't seek it, the grantors from coming back in and seeking to have the property revert back, the ownership revert back to them because of the violation. That verter clause wasn't in there, and so that avenue of relief isn't available. We'll admit that. But that doesn't mean that they can't enforce the covenant through injunction, damages. I agree with that. I agree with that. But it is an element to consider on the intent of the parties that are entering into the agreement.  Yes. I have one other question. Your suit against Mr. Hodge for malpractice, and Ms. Hamilton points out that he was not the client. He's not the lawyer for your client. How is it that they can sue him for malpractice? Under what theory? Yes. We'll admit that there's no privity there and that our clients were not his clients, but there was a special duty owed here. Again, this wasn't like a divorce proceeding where it was adversarial. So there was no situation where Mr. Hodge was arguing strenuously for his client's interest. It was a transaction, barely agreeable, not adversarial, and there was a duty. He undertook the duty afterwards to record the deeds, and for all we know, he did that properly under the conveyance act, and everything was fine. And the grantors relied on him to do it. They didn't have their attorney go with him to the recorder's office. So that duty extended after the initial recording to observe the law and not go in and then change the deeds later, surreptitiously, without either the consent or even the knowledge of the grantors. And again, it's important to realize the first time the grantors knew about any of this was in December of 2014 when our client's real estate attorney was contacted asking if they would consent to changes, to alterations in those covenants. And they declined, but knowing, well, knowing that it had already been done. Some misdeeds had already been done. All right, we will thank the attorneys for their arguments here today. We'll take your case under advisement, and we'll take a short recess.